UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JACK BURKET, et al.,
JENNIFER ADAMS, et al.,
WILLIAM CLIFF, et al.,

      Plaintiffs,

v.

HYMAN LIPPITT, P.C., et al.,

      Defendants.
_____/    Case No. 05-72110
                                   Case No. 05-72171
HYMAN LIPPITT, P.C., et al.,        Case No. 05-72221

      Counter- and Third-Party Plaintiff,    Honorable Patrick J. Duggan

v.

KEITH MOHN, et al.,

      Counter- and Third-Party
      Defendants.
_____/


**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
HYMAN LIPPITT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS
TO ALL NON-CLIENT PLAINTIFFS AND GRANTING IN PART AND
DENYING IN PART HYMAN LIPPITT DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO REMAINING PLAINTIFFS**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on April 23, 2008.

    PRESENT:      THE HONORABLE PATRICK J. DUGGAN
                        U.S. DISTRICT COURT JUDGE

This matter is before the Court in three separate but related suits alleging Exchange Act and state law violations: *Burket, et al. v. Hyman Lippitt, et al.*, Case No. 05-72110; *Adams, et al. v. Hyman Lippitt, et al.*, Case No. 05-72171; and *Cliff, et al. v. Hyman Lippitt P.C., et al.*, Case No. 05-72221. Plaintiffs in all three of these actions are private investors who invested in Agave, Ltd. ("Agave"), an off-shore investment entity created to promote an "options trading strategy" that purported to deliver phenomenal results. However, Agave's principal securities trader, J. Patrick Kisor ("Kisor"), embezzled a large portion of Plaintiffs' investments. The Securities and Exchange Commission ("SEC") brought suit against Kisor and Plaintiffs' financial advisor, Keith Mohn ("Mohn"), and as a result of the SEC action, Plaintiffs recouped about 30% of their investments. Seeking to recoup the remainder of their investments, Plaintiffs brought these actions against: Hyman Lippitt, P.C. ("Hyman Lippitt"), a law firm located in Birmingham, Michigan that specializes in business transactions, including off-shore finance; Terry Givens, a former shareholder of Hyman Lippitt; and four of Hyman Lippitt's current shareholders and/or attorneys: Norman Lippitt, Douglas Hyman, John Sellers, and Brian O'Keefe (collectively "Defendants"). Plaintiffs allege that Defendants perpetrated a fraud in the creation of Agave, as well as in covering up their role in the Agave scheme. Hyman Lippitt later brought counter- and third-party complaints in all three actions against various individuals and entities. These actions were consolidated for discovery purposes but not for trial.

Presently before this Court are: (1) the HL Defendants'[1] "Motion for Summary Judgment As To All Non-Client Plaintiffs;" and (2) the HL Defendants' motion for summary judgment as to the remaining Plaintiffs. The Court held a hearing on the HL Defendants' motions on January 28, 2008.

Fifty-seven of the 72 remaining[2] Plaintiffs have not alleged that they were ever clients of Hyman Lippitt (hereinafter referred to as the "non-client Plaintiffs"). With respect to these non-client Plaintiffs, the HL Defendants request that the "Court grant summary judgment in their favor and against each of the non-client plaintiffs on each count asserted by these [P]laintiffs." (HL Dfts.' Br. #1 at 36.) According to the HL Defendants, "[t]his will have the effect of completely dismissing all remaining claims by the non-client plaintiffs." (*Id.*) In addition, the HL Defendants have filed a separate motion seeking summary judgment on all the remaining claims asserted by Plaintiffs. According to the HL Defendants, granting their second motion for summary judgment "would have the effect of dismissing all claims of all Plaintiffs in these cases, but would not affect either the claims asserted by the HL Defendants as Third-Party Claims and Counter-Claims, or the counter-claim pending by Keith Mohn as to Hyman Lippitt, P.C."

---

[1]The "HL Defendants" include: Hyman Lippitt, Norman Lippitt, Douglas Hyman, Brian O'Keefe, and John Sellers.

[2]Pursuant to a Joint Motion of Dismissal entered by the Court on March 1, 2007 by stipulation of the parties, the following Plaintiffs have been dismissed with prejudice from these actions: John Diguiseppe, Joanne Diguiseppe, Phillip Hernandez, Barbara Hernandez, Rita LoGrasso, and Frances Piccinni. Moreover, pursuant to a Joint Motion for Voluntary Dismissal entered by the Court on April 20, 2007, Plaintiff Curtis Callahan was dismissed without prejudice from these actions.

(HL Dfts.' Mot. #2 at 1.)

## I.    <u>Standard of Review</u>

This Court will grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e)(2) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial.  FED. R. CIV. P. 56(e)(2); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53.  It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment.  *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

4

## II.  Relevant Factual Background

The Court assumes that the reader is familiar with the factual allegations of these cases, which are set forth in the Court's December 29, 2005 Opinion and Order. Nevertheless, the Court will briefly highlight the facts relevant to its disposition of the HL Defendants' motions for summary judgment.  In doing so, the Court will construe the facts in a light most favorable to Plaintiffs as this Court must when addressing a Rule 56 motion for summary judgment.  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

### A.  Creation and Capitalization of Agave

When Mohn and Kisor met in the Spring of 2000, Kisor gave a presentation to Mohn describing "an options trading strategy" that delivered phenomenal results. Although Mohn was impressed, he told Kisor that he would "love to take advantage of what you're doing, but you're not operating legally."  (Pl.'s Resp. Exhibit E, Drabek Dep. at 10.)  At the initial meeting between Mohn and Kisor, Mohn suggested that Kisor speak with Hyman Lippitt and specifically Givens.  (*Id.* at 11.)

Sometime in early April 2000, Mohn, Givens, and Kisor met at Mohn's office.  (*Id.* at 12.)  During this meeting, Givens told Kisor that to sell securities legally he needed to either obtain a license from every state in which he planned on selling or he could work through the International Association of Professionals ("IAP"), which is based out of Florida.  (*Id.* at 13-14.)  It was at this meeting that Kisor formally retained Givens and paid a retainer of $120,000 for his legal services.  (*Id.* at 14.)

In May 2000, Givens traveled to the Cook Islands.  While he was in the Cook Islands, Givens used $25,000 of the $120,000 retainer to capitalize Globenet ("GNT"), a

5

trust company organized under the laws of the Cook Islands. (*See* Pl.'s Resp. Ex. I, Depo. Ex. No. 515 BN 4227.) Givens was a shareholder and played a management role in GNT. (*See* Pl.'s Resp. Ex. JJ, Minutes of 3/30/01 GNT Bd. of Directors Mtg.) Puai Wichman was the Chairman of GNT and John Kenning was the Secretary. (*See id.*) Pippa Kerry later acted as GNT's principal.[3]

Givens then, either alone or with other attorneys at Hyman Lippitt, devised a structure to form Agave, Ltd., an investor fund which was to be incorporated and operated by GNT. Givens began drafting the Agave subscription agreements on July 20, 2000 and continued to work on drafting the subscription agreements on July 22, 2000, as well as meeting with Defendant O'Keefe to discuss the drafting. (Depo. Ex. 501 BN 3887; Givens Depo. 75-76.) The Agave subscription agreements explained to potential investors that Agave is an international business company organized under the laws of the Cook Islands. (HL Dfts.' Mot. #1 Ex. 12 at 3.) The subscription agreements also stated that Agave "will obtain outside advisors to evaluate, appraise and execute" its investment strategies and described some of the risks associated with investments in Agave. (*Id.* at 2-3.) Finally, the subscription agreements provided that the purchaser of Agave shares acknowledges that the return on their investments is dependent on the performance of Agave's money manager. (*Id.* at 4.)

On July 26, 2000, Givens drafted and revised Agave's Articles of Incorporation.

_____

[3]In various documents used as exhibits in this case, Pippa Kerry sometimes referred to as Pippa Diamond. For ease of reference, the Court will refer to her only as Pippa Kerry in this Opinion and Order.

(Depo. Ex. 501 BN 3889.)  The next day, July 27, 2000, Agave was incorporated under the Cook Islands International Companies Act.

A "Request & Agreement for Provision of Nominee Services" (hereinafter referred to as "Nominee Services Agreement") was executed on July 27, 2000.[4]  This Nominee Services Agreement designated Givens and Kisor as "authorised persons," which means that both Givens and Kisor were "authorised to give instructions to the Firm or the Nominee [GNT] on behalf of the principal [Pippa Kerry] or such other person or persons as may be notified in writing by the Principal to the Firm from time to time."  (Pls.' Resp. Ex. II Services Agreement ¶ 1.)  Thus, the Nominee Services Agreement allowed Kerry to take instructions from Givens and Kisor.  Moreover, a May 5, 2005 facsimile sent to Mohn with GNT's logo explained that the Nominee Services Agreement is a requirement for GNT's "own internal procedures."  (*Id.* at 13.)   At his deposition, Givens could not recall the Nominee Services Agreement and the fact that Kisor was listed as an "authorised person."  (Givens Depo. at 79-80.)  Givens did, however, admit that he was an "authorised person" as defined by the Nominee Services Agreement.  (*Id.* at 81-82.)

On September 5, 2000, Wichman and Givens exchanged emails and Wichman told Givens that $5.4 Million was received (presumably at GNT's Bank, ANZ).  (Pls.' Resp. Ex. S, Depo. Ex. 523 BN 4128-29.)  On September 8, 2000, the initial $5.4 Million that was received by Agave was deposited "into a PDK account at Provident Bank."  (Pls.'

---

[4]Mohn was named as the principal in the original Services Agreement, which was received by GNT on September 13, 2000.  However, a subsequent Services Agreement backdated to the date of Agave's incorporation, July 27, 2000, was signed by Pippa Kerry.  Thus, Pippa Kerry was the named principal of GNT.

Resp. Ex. T, Kevin Barrett Aff. ¶ 33; *see also* Ex. S. Depo. Ex. 523 4128 (an email from Givens to John Kenning directing GNT to wire approximately $5.4 million to "Fund Manager [PDK International, LLC]").) "Kisor used approximately $1.3 million of these proceeds in PDK before transferring the remaining funds of approximately $4.1 million to an Agave account at Provident Bank on October 2, 2000." (*Id.*)

Sometime in September 2000, the Agave brochure was prepared by Kisor. Although the extent of Givens' involvement in the preparation of the Agave brochure is disputed,[5] there is evidence that he was involved in the reviewing the draft of the Agave brochure. (Drabek Dep. at 22-24.) The Agave brochure described the "Agave strategy" and stated that the "fund Advisor is PDK [], which has had the responsibility for the strategies since 1994." (Pls.' Resps. Ex. F.) In addition, the brochure stated that Agave "has at least doubled the performance of the S&P for the last 5 years." (*Id.*)

## B. Agave's Brokerage Account and the General Power of Attorney

On August 31, 2000, Mohn emailed Givens asking him to complete Agave's brokerage firm, or ED&F Man, application forms. (Pls.' Resp. Ex. U.) Givens emailed these applications to Wichman on or before September 8, 2000. (Pls.' Resp. Ex. V.) Later on September 25, 2000, Wichman emailed Mohn and Givens with "a draft form

---

[5]In his affidavit submitted by the HL Defendants, Givens states that he "did not draft or analyze the Agave brochure at any time prior to its printing" and that he "believe[s]" he "did not ever see the Agave brochure until after it was already printed." (HL Dfts.' Mot. Ex. 11, Givens' Aff. ¶ 2.) Drabek, however, testified in his deposition that he called Givens numerous times asking about the Agave brochure and when it would be done and that Givens reviewed various drafts of the brochure. (Drabek Depo. at 22-24, 76-77.)

Power of attorney" that was to be entered into between Agave and PDK, "giving PDK and [] Kisor authority to make investment decisions for Agave in the accounts."  (Pls.' Resp. Ex. W.)

Several ED&F Man account applications were prepared on November 30, 2000, each prepared on a standard ED&F Man form.  (Pls.' Resp. Ex. X BN 10068, 10093, 10110, 10130, and 10150.)  All of the ED&F Man account applications included a section entitled "Discretionary Trading Authorization/Power of Attorney," which was signed by Kisor as the authorized agent of Agave.  (Pls.' Resp. Ex. X BN 10082.)  With respect to one of the account applications (Account No. 1078-6721), the form entitled "Limited Trading Authorization for Third Person" authorized Gilbert Howard ("Howard") to act as Agave's agent.  (Pls.' Resp. Ex. X BN 10089.)

The "Discretionary Trading Authorization/Power of Attorney" gave Kisor "full power and authority to enter into contracts for the purchase, receipt, sale (including short sale) and delivery of . . . commodity futures contracts, commodities . . . forward contracts, securities, equity, debt and related investments . . . in one or more accounts  . . . with [ED&F] Man . . . ."  (*Id.* BN 10082-87.)  This general power of attorney also required ED&F Man to "follow the instructions" of Kisor.  (*Id.*)  By comparison, the "Limited Trading Authorization for Third Person" stated that Howard "is not authorized to withdraw any money, securities, or other property either in the name of [Agave] or otherwise."  (*Id.* BN 10089.)  According to Plaintiffs, the general power of attorney gave Kisor unfettered access to Agave funds, which allowed Kisor to invest in a manner that was inconsistent with the representations made to Plaintiffs as well as embezzle money

from the ED&F Man accounts.

Givens testified that he knew that the general power of attorney provided in the ED&F Man pre-printed form permitted withdrawals from the ED&F Man account, while the "Limited Trading Authorization for Third Person" did not. (*See* Pls.' Resps. Ex. LL, Givens Dep. 190-95.) Givens stated that he spoke with ED&F Man personnel and voiced his concerns over the general power of attorney. (*See id.* at 190-93.) ED&F Man, however, informed Givens that both the general power of attorney and the "Limited Trading Authorization for Third Person" were necessary to open an account. (*Id.* at 195.) Givens also testified that he was under the impression that there was a "structure" in place that would ensure that notice of any withdrawals from Agave's ED&F Man account would also be sent to Mohn. (*Id.* at 196.) This "structure," however, was never embodied in a written agreement.

### C.    Kisor's Non-Options Trading and Embezzlement

According to Mr. Kevin Barrett of the SEC, "of the initial funds transferred to Agave in October 2000, Kisor invested $2 million in stock of a privately held company, Znetix, Inc." (Barrett Aff. ¶ 39.) This was inconsistent with the "options trading strategy" that Agave represented to its investors in the brochure. Hyman Lippitt's billing records reflect that on October 5 and October 10, telephone calls were made to Mark Ashmore relating to "Xenetics." (Depo. Ex. 501 BN 3894.) Plaintiffs contend that "[t]hese entries leave little doubt that Givens was aware in October of 2000 that Kisor had made an improper investment and that the manner in which Agave's bank and trading accounts were set up gave Kisor the power to invest funds in other than the represented

manner without oversight or approval." (Pls.' Resp. Br. #1 at 12.)

Mr. Barrett's affidavit describes other transfers by Kisor. For example, "on January 5, 2001, Kisor transferred $2,049,500 from the Agave account at Huntington Bank to his personal account at the Bellagio Hotel and Casino in Las Vegas." (Barret Aff. ¶ 36.) "In addition . . ., Kisor also transferred approximately $2.2 million of the $17.5 million of Agave investor funds used for purposes other than options trading to accounts controlled by Howard in mid-2001. Howard used approximately $2.1 million of those funds to establish and fund NCB, a registered broker-dealer, and to buy a seat on the Chicago Board Options Exchange (CBOE)." (*Id.* ¶ 37.)

Dennis Drabek, an associate of Mohn's, testified at his deposition that it was Givens' idea for Agave to purchase a seat on the CBOE. (Drabek Depo. at 26-27.) Hyman Lippitt's billing records reveal that a new billing file was created for PDK entitled "Secondary Projects." (Depo. Ex. 501 BN 3922.) On March 9, 2001, a billing entry indicates that Sellers, Givens, and Tracey Batey, another attorney at Hyman Lippitt, met to discuss "broker/dealer" issues, presumably related to Agave's purchase of a seat on the CBOE through NCB. (*Id.* BN 3921.)

Moreover, Agave "funds were used for purposes other than options trading." (Barrett Aff. ¶ 27.) For example, Agave funds were used to make payments to Kisor and his family members, payments to employees and agents of PDK, motor vehicle expenditures, and other personal expenditures. (*See* Barrett Aff. Ex. F.) Agave investor funds were also used for gambling and to pay advisory fees to Mohn. (Barrett Aff. ¶ 35.) Based on checks from Coyote Advisory Group, Inc., which were signed by Howard,

Plaintiffs state that Hyman Lippitt received some payments from Agave investor funds as well. (Pls.' Resp. Br. #1 at 13; Pls.' Resp. Br. Ex. Y HL_013557, HL_013632, HL_013799.) Hyman Lippitt, according to Plaintiffs, received substantial fees "from multiple sources for its [alleged] role in the fraud." (Pls.' Resp. Br. #1 at 14 (referring to the multiple sources and calculating the approximate fees received by Hyman Lippitt).)

### D. Discovery of Kisor's Defalcations and the Formation of Genesis

Mohn and Givens learned of Kisor's misuse and embezzlement of Agave funds sometime in late 2001 or early 2002. (*See* HL Dfts.' Ex. 2, Mohn SEC Dep. II at 336-43.) On December 28, 2001, Givens sent a letter to Roger Mankus of ED&F Man, requesting "full and true copies of all Powers of Attorney on file with Man Financial as to Agave Limited." (Pls.' Resp. Ex. DD BN HL_014040.) That same day, Wichman also sent a letter to Mr. Mankus, which stated:

> This is to advise that until further due diligence has been completed by Mr. Terry Givens of Hyman Lippitt, our US attorneys, there are to be no wire transfers out of all and any accounts held in the name of Agave, Ltd with Man Financial, unless specifically authorised by the writer. Would you also take immediate steps to terminate all existing Powers of Attorney other than Limited Powers to Trade within Man Financial.

(Pls.'s Resp. Ex. EE BN HL_014492.) Beginning in early January 2002 and through March 2002, Hyman Lippitt billing records reveal that several telephone calls were made to ED&F Man, as well as Mohn. (Depo. Ex. 501 BN 3911-15.) These billing records indicate that meetings were held with Mohn to discuss "issues" with the ED&F Man account. (*See id.*) In addition, telephone calls were also made to "Kamine," Kisor's

attorney. (*See id.* BN 3913-15.) The telephone calls to "Kamine" ultimately resulted in a "proposed settlement agreement with [Kisor], Kamine's office, etc." (*Id.* BN 3915.) Kisor then parted ways with Agave, Givens, and Mohn.

"In February 2002, Mohn formed Genesis [Trading Associates, LLC] for the purported purpose of continuing the operations of Agave for the benefit of its U.S.-based investors." (Barrett Aff. ¶ 46.) Mohn did so without telling the Agave investors about Kisor's embezzlement and misuse of Agave funds. (Mohn SEC Dep. II at 446-47.) Mohn felt that telling Agave investors about Kisor's defalcations "would not help the situation" and he feared a "run on the bank." (Mohn SEC Dep. III at 179.) On March 1, 2002, Mohn sent a letter informing Agave investors that "Agave assets will be acquired by Genesis [] . . . . All current investors will receive equal value in Genesis shares and this will be reported on April statements." (HL Dfts.' Mot. #1, Ex. 4.) Mohn and Robin Cotterell of Hanver Corporate Services Limited, another foreign trust company Givens had engaged to form off-shore investment entities for Hyman Lippitt clients, prepared and distributed statements to Agave investors for the first quarter of 2002. (Mohn SEC Dep. III at 443-44.)

On March 27, 2002, $5 million of Agave funds were transferred to Genesis' bank account at Huntington National Bank in Columbus, Ohio. (Pls.'s Resp. Ex. HH BN HL_014016.) In total, $10 million was transferred to Genesis' bank account. (Barrett Aff. ¶ 51.) Afterwards, Genesis loaned Jason Malkin $9.7 million, $2,275,000 of which was invested in purchases of stock in three separate companies: Funny Bagel, Earthboard Sports, and LifeSmart Nutrition. (*Id.* Ex. F.)

### E.     SEC Brings Suit Against Mohn and Kisor

Later that year, in November 2002, the SEC filed suit against Kisor and Mohn, alleging that the issuance of Agave shares violated the registration and anti-fraud provisions of the federal securities laws.  For his role in the Agave fraud, Kisor was sentenced to a 90-month prison term, and as a result of the SEC lawsuit, Mohn and his entities were permanently enjoined from selling securities.  In addition, on November 22, 2002, the SEC obtained ex parte orders freezing the assets of Agave and Genesis.  (HL Dfts.' Ex. 24.)  The Court Appointed Receiver in the *SEC v. Mohn* action "has been able to distribute to Agave investors an amount equal to approximately 30% of their initial investment."  (Pls.' Resp. Br. at 17 (citing Ex. Z, Court Appointed Receiver's Amended Second Omnibus Recommendation for Treatment of Claims in *SEC v. Mohn*, Case No. 02-74634).)

## III.  <u>Applicable Law and Analysis</u>

### A.     Securities Fraud Under § 10(b) of the Exchange Act and Rule 10(b)-5 and Section 451.501 of the Michigan Uniform Securities Act

The first cause of action alleged in Plaintiffs' complaints is brought against Givens and Hyman Lippitt pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Rule 10b-5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which

14

> operates or would operate as a fraud or deceit upon any
> person,
>
> in connection with the purchase or sale of any security.

*Id.* In Count III of their complaints,[6] Plaintiffs asserts a claim against Givens and Hyman Lippitt under section 451.501 of the Michigan Uniform Securities Act ("MUSA"), which is nearly identical to § 10(b). *Compare* MICH. COMP. LAWS § 451.501 *with* 15 U.S.C. § 78j(b). Courts accordingly apply case law interpreting § 10(b) to claims brought under section 451.501 of MUSA. *See Dep't of Commerce v. DeBeers Diamond Inv., Ltd.*, 89 Mich. App. 406, 410, 280 N.W. 2d 547, 550 (1979). Therefore, the Court's analysis of Plaintiffs' securities fraud claims brought under § 10(b) and Rule 10b-5 will govern Plaintiffs' securities fraud claims brought under section 451.501 of MUSA.

The elements required to prove a securities fraud claim brought pursuant to § 10(b) and Rule 10b-5 thereunder are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008)(citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 1631 (2005)). The HL Defendants contend that Plaintiffs have failed to proffer evidence to support the first, second, fourth, and sixth elements of a securities fraud claim.

---

[6]In Count II of their complaints, Plaintiffs asserted a claim under section 451.701 of MUSA. In an Opinion and Order issued on December 29, 2005, this Court dismissed Count II in each of these three cases as untimely.

1.     Duty to Disclose and Law-of-the-Case Doctrine

The HL Defendants limit their analysis to Plaintiffs' remaining claims, focusing initially on those Plaintiffs who have securities fraud claims remaining based on alleged misrepresentations.  In their response briefs, however, Plaintiffs first contend that Hyman Lippitt and Givens owed a duty to disclose, despite this Court's earlier ruling that no such duty was owed to the non-client Plaintiffs.  Plaintiffs argue that the facts that give rise to the imposition of such a duty were not known at the time this Court entered an order dismissing the majority of the Plaintiffs' securities fraud claims based on omissions.  In making such an argument, Plaintiffs rely not only on the facts they claim give rise to a duty to disclose but also on *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998)(en banc), a case none of the parties cited in their briefs addressing Defendants' prior motions to dismiss.  In their reply briefs, the HL Defendants contend that because this Court has already decided as a matter of law that Hyman Lippitt and Givens owed no duty to disclose based on the absence of an attorney-client relationship, the law-of-the-case doctrine prohibits Plaintiffs from raising the issue of a duty to disclose.

"The law-of-the-case doctrine dictates that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 n.14 (6th Cir. 2007)(quoting *Patterson v. Haskins*, 470 F.3d 645, 660-61 (6th Cir. 2006)).  As such, it "generally discourages courts from reconsidering determinations that the court made in an earlier stage of the proceedings."  *United States v. Graham*, 327 F.3d 460, 464 (6th Cir. 2003).  However, exceptional circumstances permitting reconsideration of a previously

decided issue of law include: "(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; and (3) where a decision is clearly erroneous and would work a manifest injustice." *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997). Moreover, the law-of-the-case doctrine is discretionary "when applied to . . . the same court's own decisions." *Bowles v. Russell*, 432 F.3d 668, 677 (6th Cir. 2005)(internal punctuation and citation omitted).

The Court believes that its earlier ruling on the issue of whether Givens and Hyman Lippitt owed a duty to disclose material facts, was "clearly erroneous and would work a manifest injustice." *Hanover Ins. Co.*, 105 F.3d at 312. More precisely, this Court held that the only Plaintiffs to whom Givens and Hyman Lippitt owed a duty to disclose were those Plaintiffs who had an attorney-client relationship with Defendants. The Sixth Circuit's ruling in *Rubin*, however, renders this Court's previous holding clearly erroneous.

In *Rubin*, the Sixth Circuit sitting *en banc* stated:

> Although under Rule 10b-5 . . ., "only those individuals who had an affirmative obligation to reveal what was allegedly omitted can be held liable as primary participants in the alleged deception[, a] duty to disclose naturally devolves on those who have direct contracts with 'the other side.'" *SEC v. Coffey*, 493 F.2d 1304, 1315 (6th Cir. 1974). "Direct contacts may take many forms. An accountant or lawyer, for instance, who prepares a dishonest statement is a primary participant in a violation even though someone else may conduct the personal negotiations with a security purchaser." *Id.* at 1315 n.24. "A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant." *SEC v. Washington County Util. Dist.*,

676 F.2d 218, 223 (6th Cir. 1982).

*Rubin*, 143 F.3d at 267. Applying this standard to the facts before it, the Sixth Circuit

held that "while an attorney representing the seller in a securities transaction may not

always be under an independent duty to volunteer information about the financial

condition of his client, he assumes a duty to provide complete and non-misleading

information with respect to subjects on which he undertakes to speak." *Id.* at 268. Thus,

according to *Rubin*, an attorney involved in a securities transaction has a duty to provide

"complete and non-misleading information" when he or she "undertakes to speak" on a

particular subject whether or not there exists an attorney-client relationship.[7] *Rubin* is

controlling precedent with respect to Plaintiffs' § 10(b)/Rule 10b-5 claims.

Applying *Rubin* to this case, this Court believes that Givens (and by extension

Hyman Lippitt[8]) had a duty to disclose material facts to all of the Plaintiffs. Contrary to

_____

[7]Indeed, the plaintiffs in *Rubin* were not clients of the defendant-attorney. *Id.* at 266.

[8]Although never explicitly addressed by the HL Defendants or Plaintiffs in the briefs that were filed with respect to the HL Defendants' motions for summary judgment, the doctrine of respondeat superior applies in federal securities fraud cases. In a very recent case, the Seventh Circuit held that although the Supreme Court rejected aider and abetter liability for private civil claims of securities fraud brought under § 10(b) and Rule 10b-5 in *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994), "the doctrines of respondeat superior and apparent authority remain applicable to suits for securities fraud." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)(Posner, J.). In these cases, there is no dispute that the alleged wrongful actions taken by Givens were done while he was acting within his scope of employment. Consequently, if the Plaintiffs can prove that Givens is liable for securities fraud, Hyman Lippitt, the law firm that employed Givens during the time he engaged in the alleged fraudulent acts, can be held liable for securities fraud under the doctrine of respondeat superior.

Plaintiffs' contentions, this duty is not a general, free-floating obligation.[9]  Rather, Givens and Hyman Lippitt only had a duty to disclose material facts with respect to subjects in which Givens spoke.  *See Rubin*, 143 F.3d at 268.  In this case, there is evidence that Givens prepared the Agave subscription agreements, which were furnished to Plaintiffs (and Givens must have known that they would be).  Thus, by virtue of his preparation and knowledge that these documents would be furnished to Plaintiffs, Givens had "direct contacts" with Plaintiffs.  *See Coffey*, 493 F.2d at 1315 n.24.

Plaintiffs also argue that Givens and Hyman Lippitt owed a duty to disclose based on Givens' involvement with the preparation of the Agave brochure.  Construing the evidence in a light most favorable to Plaintiffs, this Court believes that the evidence in the

---

[9]Plaintiffs argue that the following facts, which were not known at the time this Court dismissed the non-client Plaintiffs, require the imposition of a duty to disclose upon Hyman Lippitt and Givens: "(i) the entire purpose of Givens' involvement with Kisor was because Mohn wanted to legally offer his clients the opportunity to invest with Kisor, recognized that Kisor needed a lawyer to do this, and referred him to Givens; (ii) Mohn looked to Givens to create an investment structure which would not permit Kisor to misappropriate funds; (iii) Givens 'prepared' the ED&F Man Accounts; (iv) Givens prepared subscription agreement which purported to disclose certain risks but which did not disclose that Kisor [had the power to misappropriate funds]."  (Pls.' Resp. Br. #2 at 16.)  Plaintiffs also state that "Mohn has testified that (i) Givens specifically represented to him that Kisor did not have access to investor funds and (ii) on one occasion when Mohn was informed that Kisor had transferred funds improperly, Givens assured Mohn that the amounts transferred were in payment of fees legitimately owed to Kisor and that controls were in place so that this could not occur in the future."  (*Id.*)

Assuming these "facts" are true, this Court believes that except for the fact that "Givens prepared subscription agreements which purported to disclose certain risk but which did not disclose that Kisor had such power," Plaintiffs' reliance on these "facts" is insufficient to impose a duty of disclosure.  As stated above, a duty to disclose arises only when an attorney assumes a duty to provide information about the sale of securities to a potential investor.  Aside from the Givens preparation of the subscription agreements, all of the "facts" outlined by Plaintiffs do not impose some general, amorphous duty upon Givens and Hyman Lippitt to disclose material facts.

record shows that Givens reviewed Kisor's drafts of the Agave brochure sometime before it was distributed to potential investors. (*See* Pls.' Ex. E, Drabek Dep. at 24-25, 76-77.[10]) In this Court's opinion, it is reasonable to infer that because Givens may have reviewed Kisor's drafts of the Agave brochure sometime before it was submitted to potential investors, he may have played a role in preparing the Agave brochure. Therefore, there is a genuine issue of material fact as to whether Givens' role in the preparation of the Agave brochure constituted "direct contacts" with Plaintiffs. *See Coffey*, 493 F.2d at 1315 n.24.

The duty to disclose that Givens (and by extension Hyman Lippitt) owed to the non-client Plaintiffs applies only to the Agave subscription agreements and the Agave brochure, as there is no other evidence of "direct contacts" with the non-client Plaintiffs.[11] The Court will therefore consider Plaintiffs' omission-based securities fraud claims that are premised on the alleged omission or omissions in the Agave subscription agreements and the Agave brochure.[12]

---

[10]In their briefs, Plaintiffs cite page 75 of Drabek's deposition transcript. Page 75, however, was never provided to the Court.

[11]Plaintiffs also proffer the deposition testimony of Plaintiffs Cliff, Roderick, Lemire, and McLaughlin showing that Givens met personally with these Plaintiffs. To the extent that Plaintiffs may be relying on their personal meetings with Givens as "direct contacts," they did not allege that Givens omitted material information during these personal meetings in their complaints.

[12]The Court's finding does not, however, affect its previous determination that Plaintiffs John McLaughlin, McLaughlin Ford, Inc., McLaughlin Enterprises, Inc., C.B.S. Agency, Inc., Jaymac, Inc., Donald Lemire, and William Cliff, with respect to all but the June 2001 $200,000 investment in Agave shares, lack standing to assert a § 10(b)/Rule 10b-5 claim. (12/29/05 Op. & Or. at 13, 40; 4/3/06 Op. & Or. at 5, 11.) Nor does it affect the Court's previous determination that the MUSA (Section 451.501) claims of 21 Plaintiffs in the *Adams* case and four Plaintiffs in the *Burket* case are untimely. (12/29/05 Op. & Or. at 33, 41.)

Before doing so, however, the Court will address certain arguments made by the HL Defendants. First, the HL Defendants contend that *Rubin* does not impose "a free-floating 'duty to disclose' to any potential investor who had 'direct contacts' with any lawyer in the firm." (HL Dfts.' Rep. Br. at 11.) According to the HL Defendants, *Rubin* "addresses only omissions which make previously-rendered affirmative representations misleading." (*Id.*) Because Plaintiffs have failed to point to any misrepresentation, the HL Defendants contend that *Rubin* is inapplicable to this case. This Court refuses to endorse such a reading of *Rubin*. Here, as stated above, Givens made representations to Plaintiffs when he prepared the Agave subscription agreements and undoubtedly knew that these documents would be distributed to investors.

The HL Defendants also rely on *Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991) and *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) in arguing that Hyman Lippitt owed no duty to disclose to the non-client Plaintiffs. These holdings, in addition to lacking precedential value in this Circuit, conflict with *Rubin* as they apply a stricter standard in determining whether a lawyer or law firm can be held liable for primary violations of § 10(b) and Rule 10b-5. *See Ziemba*, 256 F.3d at 1207; *Schatz*, 943 F.2d at 490.

2. <u>Material Omission</u>

As indicated above, Plaintiffs contend that there was a material omission in the Agave subscription agreements and the Agave brochure. According to Plaintiffs, this omission included the fact "that only Givens and Kisor had the power to direct the affairs of Agave and the fact that Kisor had the power to withdraw Agave's funds from its

accounts at ED&F Man and the Huntington Bank."[13]  (Pls.' Resp. Br. #1 at 20.)  The HL

Defendants do not dispute that this was omitted from the Agave subscription agreements

or the Agave brochure.  (*See* HL Dfts.' Mot. #1 Ex. 12 (Subscription Agreements) & 13

(Agave brochure).)   Nor is there any dispute that this omission was material.

Consequently, the HL Defendants are not entitled to summary judgment based on

Plaintiffs' failure to produce evidence of an omission.

### 3. Material Misrepresentations

As stated above, the HL Defendants' arguments are focused primarily on the

Plaintiffs' misrepresentation-based securities fraud claims.  In their complaints, Plaintiffs

allege they were sold Agave shares based on one misrepresentation: the

"[m]isrepresentation of Kisor's prior performance, and, from October 2000 forward, the

performance of Agave."  (*Burket* TAC ¶ 87(i).[14])  Plaintiffs made passing references to

this misrepresentation in their briefs and at the hearing.  Assuming this misrepresentation

is material, Plaintiffs have failed to proffer any evidence showing that each individual

---

[13]In their briefs filed in response to the HL Defendants' motions and at the hearing, Plaintiffs stated that there are other omissions that form the basis of their federal and state law securities fraud claims.  At the hearing, however, counsel for Plaintiffs stated that the fact that Givens failed to disclose that Kisor had access to Agave funds was the "at the heart" of Plaintiffs' federal and state law securities fraud claims.  Therefore, because neither the HL Defendants nor Plaintiffs make any arguments regarding any other omission besides the fact "that only Givens and Kisor had the power to direct the affairs of Agave and the fact that Kisor had the power to withdraw Agave's funds from its accounts at ED&F Man and the Huntington Bank," the Court does not address any of the other omissions.

[14]Unless otherwise indicated, when referring to the complaints in these cases, the Court will only refer to the Third Amended Complaint in *Burket*, and when doing so, the Court will use the abbreviation "TAC."

Plaintiff relied on this misrepresentation.[15]  Therefore, the HL Defendants are entitled to

summary judgment with respect to any misrepresentation-based securities fraud claim

asserted by Plaintiffs.

Furthermore, at the hearing, Plaintiffs argued that Givens misrepresented to Mohn

that the investors money would be "safe."  Plaintiffs never alleged this specific

misrepresentation in their complaints (*see, e.g., Burket* TAC ¶ 87), as required by the

Private Securities Litigation Reform Act of 1985 ("PSLRA").  *See* 15 U.S.C. § 78u-

4(b)(1)("[T]he complaint shall specify each statement alleged to have been misleading,

the reason or reasons why the statement is misleading, and, if an allegation regarding the

statement or omission is made on information and belief, the complaint shall state with

particularity all of the facts on which that belief is formed.").  Therefore, because

Plaintiffs never pleaded the alleged misrepresentation that Givens made to Mohn in their

complaints as required by the PSLRA, Plaintiffs cannot rely on this alleged

---

[15]Unlike omission-based securities fraud claims, reliance is not presumed with respect to misrepresentation-based securities fraud claims.  *Poulos v. Caesars World Inc.*, 379 F.3d 654, 666 (9th Cir. 2004)("The shortcut of a presumption of reliance typically has been applied in cases involving securities fraud, and even then, the presumption applies only in cases involving primarily 'a failure to disclose' – that is cases based on omissions as opposed to affirmative misrepresentations.")(citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54, 92 S. Ct. 1456, 1472 (1972)).  These cases are not class actions.  Therefore, where, as here, the HL Defendants filed a motion for summary judgment that was properly made and supported, each individual Plaintiff is required to submit evidence that he or she or it relied on any alleged misrepresentation that they claim resulted in securities fraud under 10(b)/Rule 10b-5 or MUSA.  *See* Fed. R. Civ. P. 56(e)(2).  Because Plaintiffs have failed to proffer any evidence of reliance on any alleged misrepresentation in connection with their Agave investments, the Court will grant the HL Defendants' motions to the extent they seek summary judgment as to any misrepresentation-based securities fraud claim Plaintiffs may be asserting.

misrepresentation.

The Court's remaining analysis of Plaintiffs' securities fraud claims is therefore limited to Plaintiffs' omission-based securities fraud claims.

4. Scienter

"To establish liability under 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, 2507 (2007)(quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94, 96 S. Ct. 1375, 1382 (1976)). The Sixth Circuit has held that actual knowledge of the falsity of affirmative misrepresentations will satisfy the scienter requirement. *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). Furthermore, a high degree of recklessness may also satisfy the scienter requirement where the defendant engaged in "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *D.E.&J P'ship v. Conaway*, 284 F. Supp. 2d 719, 745 (E.D. Mich. 2003).

The HL Defendants argue that "[t]he alleged 'evidence' proffered by Plaintiffs is not evidence of Givens' scienter, but rather (at most) evidence alleging negligence." (HL Dfts.' Br. #2 at 18.) Plaintiffs contend that "there is no doubt that Hyman Lippitt acted with *scienter*." (Pls.' Resp. Br. #1 at 22 (emphasis in original).) In so arguing, Plaintiffs point to the evidence that Givens was aware that the general power of attorney gave Kisor the power to withdraw Agave's funds from the ED&F Man accounts without oversight. (*See* Pls.' Ex. LL, Givens Dep. at 190-95.)

In this Court's opinion, Givens' knowledge that the general power of attorney gave

Kisor the power to withdraw funds without oversight is sufficient to raise a genuine issue of fact as to whether Givens' omission of this information was "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *D.E.&J P'ship*, 284 F. Supp. 2d at 745. Givens testified at his deposition that he recognized the risk the general power of attorney posed to Agave investor funds. (Givens Dep. at 190-95.) Nonetheless, Givens prepared the Agave Subscription agreements and may have prepared the Agave brochure without disclosing this risk. Therefore, the HL Defendants are not entitled to summary judgment based on the lack of any evidence regarding scienter.

     5. <u>Reliance</u>

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the 10(b) private cause of action." *Stoneridge Investment Partners, L.L.C.*, 128 S. Ct. at 769. "In the case of omission or nondisclosure of material facts, the element of reliance on the part of the plaintiffs may be presumed." *Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 918 (6th Cir. 1991). In other words, "positive proof of reliance is not a prerequisite to recover [in a failure-to-disclose case.] All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54, 92 S. Ct. 1456, 1472 (1972)(alterations as quoted in *Rubin*, 143 F.3d at 268).

This Court believes that Kisor's unfettered access to Agave's ED&F Man and bank accounts was "material in the sense that a reasonable investor might have considered [it]

important in the making of [his or her] decision" to invest in Agave. *Id.* Accordingly, Plaintiffs are entitled to a presumption of reliance.

      6.      <u>Loss Causation</u>

Success in a § 10(b) private securities fraud action requires a plaintiff to prove "loss causation." *See Stoneridge Inv. Partners, L.L.C.*, 128 S. Ct. at 768; *see also* 15 U.S.C. § 78u-4(b)(4)("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which plaintiff seeks to recover damages.")  "Loss causation requires 'a causal connection between the material misrepresentation [or omission] and the loss.'" *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 920 (6th Cir. 2007)(quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 1631 (2005)).  "It has been likened to proximate cause in tort law." *Id.* (citing *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 213 (2d Cir. 2000)).  "Furthermore, loss causation cannot be found if an intervening cause was responsible for the plaintiff's economic loss." *D.E. & J L.P. v. Conaway*, 284 F. Supp. 2d 719, 749 (E.D. Mich. 2003)(citations omitted).  In the end, however, "[p]roximate causation and intervening cause are usually issues for the jury to resolve." *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003)(citing *Exxon Co. U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840-41, 116 S. Ct. 1813, 1819 (1996)).

The HL Defendants assert that Plaintiffs' proffered evidence is insufficient to prove loss causation for three reasons.  First, in addition to other intervening causes they argue

are sufficient to break the chain of causation,[16] the HL Defendants argue that nothing

could have prevented Kisor from embezzling. Second, the HL Defendants contend that

there is no evidence that Plaintiffs invested before Kisor embezzled. Third, because the

alleged omission was the failure to disclose the fact that Kisor had a general power of

attorney allowing him to withdraw money from Agave's ED&F Man accounts without

oversight, the HL Defendants argue that Plaintiffs must prove that their funds were

actually deposited into Agave's ED&F Man accounts and they cannot.[17]

---

[16]In their brief in support of their second motion for summary judgment, the HL Defendants assert that the following "actions (and inactions) of numerous people other than Terry Givens were intervening causes of the Plaintiffs' losses" (HL Dfts.' Br. #2 at 24):

A.  "[O]n August 24, 2000, before the ED&F Man power of attorney was signed, Kisor asked Mohn to send two million dollars in Agave funds to one of PDK's banks in Cincinnati, so that he could start 'a real estate deal.'" (*Id.* (citing Ex. 26).)

B.  "Kisor supplied false data to the trust company which was then used to calculate investors' monthly account statements." (*Id.* (citing *Adams* FAC ¶¶ 160, 163; *Burket* TAC ¶¶ 65, 67; *Cliff* FAC ¶¶ 42, 53).)

C.  "On Jan. 05, 2001, Agave's Huntington Bank wired $2,049,500.00 to Kisor's account at the Bellagio Hotel, in Las Vegas." (*Id.* (citing Ex. 27).)

D.  "On Mar. 04, 2001, Mohn falsely represented in an e-mail to Agave's trust company in the Cook Islands that 'for almost <u>seven years</u> we have been able to generate a 8%-10% monthly return on investment." (*Id.* (citing Ex. 20).)

E.  "On May 01, 2001, Agave's trust company sent an e-mail to Mohn alerting Mohn to Kisor's apparent defalcation of $500,000 from the Agave account without routing the funds through an Agave bank account." (*Id.* (citing Ex. 28).)

[17]In addition, the HL Defendants contend that "Plaintiffs' dogged insistence that all of their damages flow from Givens' alleged failure to correct a 'defective' form power of attorney is ludicrous." (HL Dfts.' Br. #2 at 23.) However, they do so in contending that there are several intervening causes of the Plaintiffs' losses. (*Id.* at 24.)

Plaintiffs respond contending that Mr. Barrett's affidavit, "the accuracy of which has never been questioned, establishes that approximately $25.1 million in investor funds were deposited into the ED&F Man Accounts and that $5.2 million in investor funds were not." (PLS.' Resp. Br. #2 at 26.)  Plaintiffs rely on the following paragraphs of Mr. Barrett's affidavit:

> 33.  After Agave was formed and Mohn and Kisor began to raise money from investors, Kisor has admitted, and bank records have confirmed, that Kisor often commingled PDK and Agave investor funds.  In the vast majority of these instances, Agave funds were transferred into PDK.  For example, the initial transfer of nearly $5.4 million of Agave investor funds by [GNT] on September 8, 2000 was made into a PDK account at Provident Bank.  Kisor used approximately $1.3 million of these proceeds in PDK before transferring the remaining funds of approximately $4.1 million to an Agave account at Provident Bank on October 2, 2000.  Kisor used these funds to: partially repay an existing PDK investor; transfer money to as-yet determined third party accounts; and purchase an automobile.
>
> .   .   .
>
> 35. Although a complete tracing of funds has not been completed due to the unavailability of offshore bank account records and ongoing document production by domestic financial institutions, it appears that more than $17.5 million of Agave investor proceeds were used for purposes other than options trading.  Specifically, documents made available to staff and reviewed thus far confirm that Agave investor funds were used for the following purposes: payments to Kisor, his family, other relatives, and friends; personal, non-business expenditures by Kisor; gambling, motor vehicles; payments to purported agents of PDK, including salaries (and including Howard, as discussed below); advisory fees to Mohn; investor repayments; and non-options-related investments.  In addition, approximately $2.3 million of the more than $17.5 million of Agave funds used for purposes other than options trading were paid to identified third parties for unknown purposes and approximately $2.5 million of these funds were paid to as-yet undetermined third parties.

(Barrett Aff. ¶¶ 33, 35 (citations omitted).) Plaintiffs argue that based on the foregoing paragraphs, "it is in fact undisputed that all of the funds invested by Plaintiffs were deposited in the ED & [*sic*] Man Accounts from which Kisor embezzled or misappropriated approximately $17.5 million." (PLS.' Resp. Br. #2 at 26 (citing Barrett Affidavit ¶ 35).)

Here, Plaintiffs' securities fraud claims are based on Givens' omission of Kisor's general power of attorney, which allowed Kisor to embezzle Agave investor funds from the ED&F Man accounts. It follows, then, that to prove "loss causation," or that Givens' omission caused their economic losses, Plaintiffs must show that their investments were at one time in one of Agave's ED&F Man accounts while Kisor's general power of attorney was in effect. Based on the above-referenced paragraphs of Mr. Barrett's affidavit as well as one other paragraph that was not cited by Plaintiffs, this Court believes that Mr. Barrett's affidavit shows that Plaintiffs' investments may have been in one of Agave's ED&F Man accounts while Kisor's power of attorney was in effect. In paragraph 27 of his affidavit, Mr. Barrett states of the "approximately $31 million [that] was raised through the offer and sale of shares in Agave . . . [,] approximately $25.1 million of these funds were deposited in Agave accounts held at ED&F Man and at least $5.2 million of these funds were not deposited in Agave brokerage accounts." (Barrett Aff. ¶ 27.) In this Court's opinion, it is reasonable to infer, based on Mr. Barrett's affidavit, that some of the Plaintiffs' investments were part of the $25.1 million in Agave funds that were deposited in Agave accounts held at ED&F Man, $17.5 million of which

Kisor may have embezzled.[18]  (*Id.* ¶ 37.)  Consequently, this Court believes that Plaintiffs have proffered evidence sufficient to show a genuine issue of material fact as to whether Givens' omission that Kisor had access to Agave funds by virtue of the general powers of attorney may have caused Plaintiffs' losses.

This Court also believes that there are genuine issues of material fact as to whether Kisor's embezzlement, as well as the other alleged intervening causes, are sufficient to break the chain of causation.  With respect to Kisor's embezzlement, the HL Defendants argue, without citation to any case, that this alone is sufficient to break the chain of causation.  The evidence in the record, however, shows that Givens was aware of the general powers of attorney Kisor had with respect to Agave's ED&F Man brokerage accounts.  (*See* Pls.' Ex. LL, Givens Dep. at 190-95.)  Therefore, because the evidence in this record suggests that Givens (and by extension Hyman Lippitt) had knowledge that Kisor had unfettered access to Agave's brokerage accounts, this Court believes that whether Kisor's embezzlement breaks the chain of causation is a question of fact for a

---

[18]The Court notes that Mr. Barrett's affidavit does not conclusively establish that Plaintiffs' investments were placed in Agave's ED&F Man accounts.  Nor does it conclusively establish that if Plaintiffs' investments were placed in Agave's ED&F Man accounts, they were embezzled by Kisor.  Instead, Mr. Barrett's affidavit merely suggests that Kisor could have embezzled the Plaintiffs' investments (at least those Plaintiffs who invested in Agave prior to Kisor's embezzlement), which were at one time in Agave's ED&F Man accounts.

Plaintiffs' complaints allege that each individual Plaintiff invested at various times from September 14, 2000 to March 20, 2003.  (*Adams* FAC ¶¶ 135, 137 (alleging that Kathryn and Laurence Mohn purchased Agave shares on September 14, 2000); *see also id.* ¶ 158 (alleging that Neil Von Felt purchased Agave shares "on or about March 20, 2003").)  Therefore, at trial, each individual Plaintiff will have to show that his or her or its investment was deposited in Agave's ED&F Man accounts while Kisor's general power of attorney was in effect.

jury.  *See Wortley*, 333 F.3d at 295.  The same is true for the other intervening causes the HL Defendants list in their brief in support of their second motion for summary judgment. (*See* HL Dfts.' Br. #2 at 24 (listing other alleged intervening causes).)

In conclusion, this Court believes that genuine issues of material fact exist as to whether Plaintiffs' losses were caused by Givens' omission that Kisor had access to Agave investors' funds based on the general powers of attorney he had over Agave's ED&F Man Accounts.

### B.    Violations of § 20(a) of the Exchange Act based on Control Person Liability

Presumably as an alternative basis for liability under the Exchange Act, Plaintiffs assert, also in Count I of their complaints, that Givens and Hyman Lippitt "are also liable as controlling persons of Agave within the meaning of Section 20(a) of the '34 Act." (*Burket* TAC ¶ 80.)  Section 20(a) provides:

> Every person who, directly or indirectly, controls[19] any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To establish control person liability under § 20(a): (1) the controlled person must have committed an underlying violation of the securities laws; (2) the

---

[19]"Control" is defined as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2.

controlling person must have directly or indirectly controlled the person liable for the securities law violation; and (3) the defendant must have "culpably participated" in that underlying violation. *See D.E. & J. Ltd. P'ship*, 284 F. Supp. 2d at 750 (citing *In re Rospatch Sec. Litig.*, 760 F. Supp. 1239, 1248 (W.D. Mich. 1991)). In theses cases, Plaintiffs allege only that Givens and Hyman Lippitt are liable as controlling persons of Agave under § 20(a).

The HL Defendants do not dispute that Agave committed an underlying violation of the securities laws. Rather, focusing on the second and third elements, the HL Defendants argue that Plaintiffs' § 20(a) claims suffer from three evidentiary defects. First, the HL Defendants contend that there is no evidence that Givens controlled Agave. Second, the HL Defendants argue that Plaintiffs fail to "identify any evidence of culpable participation in Agave's securities law violations." (HL Dfts.' Rep. Br. #2 at 14.) Third, the HL Defendants assert that there is no evidence that Hyman Lippitt, "as a firm," culpably participated in the underlying securities violation by Agave.

This Court disagrees with the HL Defendants first argument. In their briefs, Plaintiffs argue that the requisite control by Givens is made out by the following facts:

- Givens' admission that he was designated by the "Request & Agreement for Provision of Nominee Services" as an "authorised person," meaning that the Pippa Kerry, the "principal" of GNT was required to take direction from Givens (*See* Givens Depo. 80-82; Pls.' Resp. Ex. II, Request & Agreement for Provision of Nominee Services ¶ 1 and Schedule 4.)

- Hyman Lippitt's billing records contain entries for telephone calls, emails and letters to Pippa Kerry (*See generally* Pls.' Ex. H);

- Givens's written communications to GNT, ED&F Man and others regarding receipt and transfers or allocations of Agave funds;

- Once Kisor's misconduct was discovered, Givens instructed ED&F Man to terminate Kisor's power of attorney;

- Once Kisor's misconduct was discovered, Givens spoke with Robin Cotterell about transfers of Agave funds;

- Once Kisor's misconduct was discovered, Givens instructed others to make the actual transfers of Agave funds;

- Givens prepared the subscription agreements and ED&F Man account application documents; and

- Givens played a role in the preparation of and reviewed the Agave brochure.

(Pls.' Resp. Br. at 24-25 (citing evidence in the record).) Plaintiffs also proffer the affidavit of Robin Cotterell, in which Mr. Cotterell states that Givens told him sometime in 2001 that "he was in charge of Agave." (*Adams*, Doc. No. 260, Cotterell Aff. ¶ 30.) In this Court's opinion, although the evidence proffered by Plaintiffs by no means establishes conclusively that Givens controlled Agave, Plaintiffs have proffered evidence sufficient to create a genuine issue of material fact as to whether Givens controlled Agave.

Moreover, the HL Defendants' second argument is also unavailing. Based on the evidence in the record, this Court believes that a reasonable jury could infer that Givens "culpably participated" in Agave's underlying violations of the securities laws.

Finally, with respect to the HL Defendants' third argument, Plaintiffs argue that because there is evidence that Givens controlled Agave, general corporate and agency law imposes liability on Hyman Lippitt as a result of Givens' control over Agave. The HL Defendants disagree and contend that Plaintiffs have failed to provide any authority for this proposition. More specifically, the HL Defendants argue that "there are solid reasons why courts steadfastly decline to impose federal securities 'control person liability' on firms for actions of their employee." (HL Dfts.' Rep. #2 at 15.) First, the HL Defendants contend that holding an employer liable for the actions of its employee would negate the requirement that the law firm did something wrong. Next, the HL Defendants contend that "[t]he second reason why courts decline to impose control person liability by means of agency law is because the control person statute includes an express exception for a party's good faith." (*Id.* at 16 (citing 15 U.S.C. § 78t(a)).) Finally, the HL Defendants argue that holding Hyman Lippitt liable without any showing that it, "as a firm," culpably participated in the alleged control over Agave would expand liability under § 20(a) beyond that which is precluded by § 10(b).

Although the HL Defendants cite cases in support of their arguments, all of the cases cited in their briefs are not binding precedent in the Sixth Circuit, do not stand for the proposition they are used to support, or are distinguishable. For example, the HL Defendants rely heavily on *Sheinkopf v. Stone*, 927 F.2d 1259, 1270 (1st Cir. 1991). The plaintiff in *Sheinkopf* sued the law firm of "an entrepreneurial attorney, who unwisely conducts personal business from his law office," under § 20(a) of the Exchange Act. *Id.* at 1270. Unlike the evidence in *Scheinkopf*, there is evidence in this record that Hyman

Lippitt billed for the services Givens performed in creating and acting as counsel for Agave. As this Court held above, there are genuine issues of material fact with respect to whether Givens' services constitute the requisite control for the purposes of a § 20(a) claim. Therefore, this Court finds *Sheinkopf* distinguishable.

This Court also finds the HL Defendants' remaining arguments unpersuasive. Contrary to the HL Defendants' contention, Givens, the alleged controlling person, can still assert § 20(a)'s good faith defense, which if successful, would negate the liability of Hyman Lippitt. Moreover, as stated above, *see supra* page 22 n. 11, the doctrine of respondeat superior applies to suits for securities fraud, *Makor Issues & Rights, Ltd.*, 513 F.3d at 708, and this Court does not believe a separate rule is warranted as to "controlling person" securities fraud claims brought pursuant to § 20(a).

For the foregoing reasons, this Court will deny the HL Defendants' motion for summary judgment with respect to Plaintiffs' securities fraud claims that are based on control person liability under § 20(a).

### C.      Fraud

In all three of these cases, Plaintiffs assert a claim for common law fraud against Givens and Hyman Lippitt. The elements of fraud are: (1) the defendant made a material misrepresentation; (2) the representation was false; (3) at the time of making the representation, the defendant knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) the defendant made it with the intention that it should be acted upon by the plaintiff; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff thereby suffered injury. *Hi-Way Motor Co. v. Int'l Harvester*

*Co.*, 398 Mich. 330, 336, 247 N.W. 2d 813, 816 (1976).

The Court finds that its analysis as to Plaintiffs' misrepresentation-based securities fraud claims controls as to Plaintiffs' misrepresentation-based common law fraud claims. Therefore, to the extent that Plaintiffs are asserting a misrepresentation-based common law fraud claim, Plaintiffs' claims are dismissed as Plaintiffs have failed to adduce evidence of actual reliance on any misrepresentation.[20] *See supra* page 24-25 and note 14.

Plaintiffs also contend that Hyman Lippitt and Givens can be held liable for "silent fraud." Although this Court previously dismissed the "silent fraud" claims of all the non-client Plaintiffs, holding that without an attorney-client relationship there is no duty to disclose, it will nevertheless address Plaintiffs' arguments with respect to "silent fraud."

Under Michigan law, "[t]here need not be an affirmative misrepresentation to constitute fraud, but fraud 'may be consummated by suppression of facts and of the truth, as well as by open false assertions,' if there is a 'legal or equitable duty of disclosure.'" *Hand v. Dayton-Hudson*, 775 F.2d 757, 759 (6th Cir. 1985)(quoting *Guaranty Co. v. Black*, 412 Mich. 99, 125, 313 N.W. 2d 77, 88 (1981)). "There is an equitable duty to disclose in a business transaction when 'circumstances surrounding a particular transaction are such as to require the giving of information. . . .'" *Id.* (quoting *Ainscough v. O'Shaughnessey*, 346 Mich. 307, 316, 78 N.W. 2d 209, 214 (1956))(other citations

_____

[20]Plaintiffs also argue that the Givens and Hyman Lippitt can be held liable for "aiding and abetting" the fraud. As the HL Defendants argue, none of the Plaintiffs pleaded such a claim. Therefore, the Court will not consider whether Givens and Hyman Lippitt can be held liable for "aiding and abetting" the fraud under common law.

omitted).

As this Court held above with respect to Plaintiffs' securities fraud claims, at the time Givens omitted the fact that Kisor would have unfettered access to Agave funds in the Agave subscription agreements, he had a duty to disclose to Plaintiffs. A similar rationale applies here with respect to Plaintiffs' claims for "silent fraud." Because the business transaction at issue in this case was Plaintiffs purchase of securities, the circumstances surrounding Plaintiffs purchase of Agave shares required Givens to disclose material information. The evidence in this record shows that Givens knew that Kisor had unfettered access to Agave funds, appreciated this risk, yet failed to disclose this fact in the Agave subscription agreements and the Agave brochure. Just as this gives rise to a duty to disclose with respect to federal securities fraud, it also gives rise to a duty to disclose under Michigan common law.

The HL Defendants argue that Plaintiffs misunderstand the law of "silent fraud" in Michigan and state that "one who argues simply that his opponent has a generalized duty to disclose, and who presents evidence that the opponent says nothing – has not proven silent fraud under Michigan law." (HL Dfts.' Rep. #2 at 19.) In making this argument, the HL Defendants rely on *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 30, 585 N.W. 2d 33, 38 (1998) and *Buntea v. State Farm Mut. Auto Ins. Co.*, 467 F. Supp. 2d 740, 745 (E.D. Mich. 2006). In *M&D, Inc.*, the Michigan Court of Appeals held:

> [I]n order to establish a claim of silent fraud, there must be evidence that the seller made some sort of representation that was false. It is not enough . . . that the seller had knowledge of the defect and failed to disclose it; rather, the seller must make some type of misrepresentation. A misrepresentation

> need not necessarily be words alone, but can be shown where
> the party, if duty-bound to disclose, intentionally suppresses
> material facts to create a false impression to the other party.

*M&D, Inc.*, 231 Mich. App. at 25, 585 N.W. 2d at 36.  Moreover, in *Buntea*, the court

held that when there is a duty to disclose, "[t]he misrepresentation occurs when a party

suppresses part of the truth when asked, not by mere nondisclosure."  *Buntea*, 467 F.

Supp. 2d at 745.

This Court believes that the HL Defendants' reliance on *M&D, Inc.* and *Buntea* is

misplaced.  In this case, there was more than a mere nondisclosure.  The Agave

subscription agreement explained some of the risks attendant to the purchase of Agave

shares.  (*See* HL Dfts.' Mot. #1, Ex. 14 at pp. 2, 6.)  In this Court's opinion, by disclosing

some of the risks attendant to the purchase of Agave shares while failing to disclose the

fact that Kisor had access to Agave funds, a reasonable jury could conclude that Givens

(and by extension Hyman Lippitt) acted fraudulently.  Moreover, like omission-based

securities fraud claims, silent fraud claims do not require proof of individual reliance.  *See*

*Lackowski v. Twinlab Corp.*, 00-75058, 2001 U.S. Dist. LEXIS 25634, at * 26-27 (E.D.

Mich. Dec. 28, 2001)(Borman, J.); *Gasperoni v. Metabolife*, 00-71255, 2000 U.S. Dist.

LEXIS 20879, at *19 (E.D. Mich. Sept. 27, 2000)(Cohn, J.).  Therefore, Hyman Lippitt is

not entitled to summary judgment as to Plaintiffs' silent fraud claims.

### D.    Conspiracy to Defraud

As Count IV in each of these cases, Plaintiffs assert conspiracy to defraud claims

against Givens and the HL Defendants.  Plaintiffs' conspiracy to defraud claims can be

summarized as follows.  When Mohn transferred Agave's funds to Genesis in 2002,

Defendants Lippitt, Hyman, O'Keefe, Sellers, and Givens, as well Agave, Genesis, Kisor, Howard, and Mohn "conspired" to protect Hyman Lippitt from liability from claims by the defrauded investors.  (*See generally Burket*, TAC Doc. No. 138, Count V; *Adams*, FAC Doc. No. 36, Count V; *Cliff*, FAC Doc. No. 38, Count V.)

A "[c]ivil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Temborius v. Slatkin*, 157 Mich. App. 587, 600, 403 N.W. 2d 821, 827-28 (1986).  "The agreement, or preconceived plan, to do the unlawful act is the thing that must be proved." *Id.* at 600, 403 N.W. 2d at 828.  Moreover, "[t]o establish a conspiracy to defraud, one must show both an illegal purpose and damages." *Goldsmith v. Moskowitz*, 74 Mich. App. 506, 521, 254 N.W. 2d 561, 568 (1977).

The HL Defendants first contend that Plaintiffs have no evidence of an "agreement to conspire."  (HL Dfts.' Rep. #2 at 20.)  In so arguing, the HL Defendants rely on the affidavits of Lippitt, Hyman, Sellers, and O'Keefe in which each of these individuals expressly denies that he was "a party to any conspiracy or agreement to defraud anyone, or to prevent any person who lost monies in Agave securities from pursuing any claim such person might have for recovery of the amounts lost."  (*See, e.g.*, HL Dfts.' Mot. #2, Ex. 29, Lippitt Aff. ¶ 3.)  Moreover, each of the individual HL Defendants also state in their affidavits that "[t]o [their] knowledge, no one else affiliated with Hyman Lippitt is or has been a party to any conspiracy or agreement to defraud anyone, or to prevent any person who lost monies in Agave securities pursuing any claim such person might have for the amounts lost."  (*Id.* ¶ 4.)  The HL Defendants contend that Plaintiffs do not present

any admissible evidence in their response and thus, "[t]his is a textbook 'failure of proof' claim."

Plaintiffs concede that they do not have direct evidence of a conspiratorial agreement and instead argue that they may rely on circumstantial evidence. *See Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 632 (E.D. Mich. 2005)("Under Michigan law, 'it is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact. Furthermore, conspiracy may be based on circumstantial evidence and may be based on inference.'") Plaintiffs argue that the circumstantial evidence in this record is sufficient to require a trial on the merits of their conspiracy to defraud claims.

In this Court's opinion, even if Plaintiffs have proffered sufficient circumstantial evidence from which a reasonable jury could infer a conspiratorial agreement among the HL Defendants and the other alleged conspirators, Plaintiffs' conspiracy to defraud claim must fail for another reason: Plaintiffs cannot prove that they suffered damages as a result of the actions taken in furtherance of the conspiracy.

Plaintiffs contend, without citation to any evidence, that "[h]ad the cover-up not taken place, considerable losses would have been avoided." (Pls.' Resp. Br. #2 at 37.) The proffered evidence shows that after Kisor's embezzlement was discovered and the Agave investor funds were transferred to Genesis, Genesis "transferred $9.7 million" of the funds to "Malkin in the form of unsecured personal loans with no scheduled repayments before April 2004." (Barrett Aff. ¶ 51.) Moreover, Mohn also invested the remaining Agave investor funds in three companies: LifeSmart Nutrition Technologies, Inc.; Earthboard Sports, U.S.A., and Funny Bagel, Inc. (*Id.* ¶ 56.) Nevertheless,

Plaintiffs have failed to proffer any evidence to show that any of the Agave investor funds remaining after Kisor's embezzlement were not recovered as a result of the SEC enforcement action brought in this Court against Mohn and Kisor. *See SEC v. Mohn*, Case No. 02-74634. Because Plaintiffs have failed to offer any evidence that they incurred losses based on the alleged conspiratorial agreement, their conspiracy to defraud claims must fail for want of any proof of "damages." *Goldsmith*, 74 Mich. App. at 521, 254 N.W. 2d at 568. Consequently, the HL Defendants are entitled to summary judgment on Plaintiffs' conspiracy to defraud claims on this basis.

### E. Breach of Fiduciary Duty

Plaintiffs' complaints in *Burket* and *Cliff* allege a breach of fiduciary duty claim against one or more of the HL Defendants on behalf of the following Plaintiffs: John McLaughlin, John McLaughlin, LLC, McLaughlin Ford, Inc., McLaughlin Enterprises, Inc., William Cliff, Donald Lemire, and Thomas Roderick. (*Burket*, TAC Doc. No. 146 (Count VI); *Cliff*, FAC Doc. No. 38 (Count VII)). The HL Defendants argue that both breach of fiduciary duty claims fail to state a claim for which relief can be granted. Plaintiffs respond contending that the HL Defendants owed Plaintiffs the fiduciary duties of loyalty and disclosure.

"A fiduciary relationship arises from the reposing of faith, confidence, and trust, and the reliance of one upon the judgment and advice of another." *Ulrich v. Fed. Land Bank*, 192 Mich. App. 194, 196, 480 N.W.2d 910, 911 (1991). "Relief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Vincencio v. Ramirez*, 211 Mich. App. 501, 508, 536 N.W.2d

280, 536 N.W.2d 280, 284 (1995).

The *Cliff* Plaintiffs' breach of fiduciary duty claim fails to state a claim for which relief can be granted. Count VII of the *Cliff* complaint alleges in pertinent part:

> 109. By reason of the attorney-client relationship between Hyman Lippitt and Givens on the one hand, and McLaughlin and the McLaughlin Companies on the other hand, as more fully alleged above, Hyman Lippitt owed a fiduciary duty to said plaintiffs, including a duty of loyalty. Hyman Lippitt breached that duty by acting as alleged above, recommending to the plaintiffs that plaintiffs enter into transactions in which Givens and Hyman Lippitt had undisclosed financial interests, without disclosing their relationship to the parties to the transactions and the extent of their interest in the participating entities and the transactions.

Contrary to the *Cliff* Plaintiffs' allegations, an attorney-client relationship with McLaughlin and the McLaughlin Companies does give rise to a fiduciary relationship with the *Cliff* Plaintiffs. Moreover, because the *Cliff* Plaintiffs only allege an attorney-client relationship between "Hyman Lippitt and Givens on the one hand, and McLaughlin and the McLaughlin companies on the other hand" as a basis for imposing a fiduciary duty, (*see id.*), the *Cliff* Plaintiffs have failed to state a claim for breach of fiduciary duty. With respect to the breach of fiduciary duty claim asserted by McLaughlin and the McLaughlin Companies against Givens and the HL Defendants in the *Burket* complaint, because there is an allegation of an attorney-client relationship between McLaughlin and the McLaughlin Companies and the HL Defendants, (*see Burket* TAC ¶¶ 110-14), the HL Defendants' motion to dismiss this claim for failure to state a claim must be denied.

### F. Negligent Misrepresentation

In all three of these actions, Plaintiffs assert claims for negligence against Hyman

Lippitt and Givens.  More specifically, Plaintiffs allege that Hyman Lippitt, through

Givens, "participated in the making of false representations of material fact and omitted

to state other material facts," including the misrepresentations and/or omissions contained

in the Agave subscription agreements and brochure, "without the exercise of due care as

to whether the misrepresented facts were true or as to whether the omitted true facts

should be disclosed."  (*Burket*, Doc. No. 146 TAC(Count VII); *Adams*, Doc No. 36 FAC

(Count VI); *Cliff* Doc. FAC No. 36 (Count VIII).)  The HL Defendants and Plaintiffs

agree that these claims are claims for negligent misrepresentation.  (*See* HL Dfts.' Br. #2

at 46; Pls.' Resp. Br. #2 at 34.)  Moreover, based on the allegations in the operative

complaints and the Plaintiffs' response briefs, it is clear that Plaintiffs are relying on the

Givens' failure to disclose Kisor's access to Agave funds in the Agave subscription

agreement and brochure as a basis for their negligent misrepresentation claims.

Under Michigan law, a claim for negligent misrepresentation "requires plaintiff to

prove that a party justifiably relied to his detriment on the information prepared without

reasonable care by one who owed the relying party a duty of care."  *The Marble Cleary*

*Trust v. The Edward Marlah Muzyl Trust*, 262 Mich. App. 485, 502, 686 N.W. 2d 770,

783 (2004).  Moreover, Michigan law "imposes a duty in favor of all those third parties

who defendant knows will rely on the information *and* to third parties who defendant

should reasonably foresee will rely on the information."  *Molecular Tech. Corp.*, 925 F.2d

at 916 (citing *Williams v. Polgar*, 391 Mich. 6, 9-10, 215 N.W. 2d 149, 152-53 (1974)).

Again, the HL Defendants argue that Givens and Hyman Lippitt owed no duty to

the Plaintiffs who were never clients of the law firm Hyman Lippitt.  Contrary to the HL

Defendants' assertion, Michigan law is clear that a duty is owed to third parties who

Givens and Hyman Lippitt knew or should have known would rely on the information in

the Agave subscription agreements and brochure.  *See id.*  There is no real dispute that

Givens, and by extension Hyman Lippitt, knew or should have known that Plaintiffs

would rely on the information in the Agave subscription agreements before purchasing

Agave shares.  Therefore, this Court believes that Givens and Hyman Lippitt owed

Plaintiffs a duty for purposes of their negligent misrepresentation claims.

The HL Defendants also argue that Michigan law does not recognize a claim for

negligent omission; therefore, according to the HL Defendants, Plaintiffs' negligent

misrepresentation claims must fail as a matter of law.  Plaintiffs argue that the Sixth

Circuit in *Molecular Technology Corporation v. Valentine*, 925 F.2d 910 (6th Cir. 1991)

held that liability for negligent misrepresentation can be imposed for a failure to disclose.

As the Sixth Circuit has acknowledged in *Valentine*, "there has been little case law

development of the tort of negligent misrepresentation since the Michigan Supreme Court

recognized it as a viable cause of action in *Williams v. Polgar*, 391 Mich. 6, 215 N.W. 2d

149 (1974)."  *Id.* at 915.  Although the HL Defendants argue that Michigan courts do not

recognize a claim for negligent misrepresentation for omissions, this Court believes that

*Polgar* teaches otherwise.  In *Polgar*, the Michigan Supreme Court held that an abstracter

can be held liable for negligent misrepresentation when he or she *omits* a recorded deed in

a title abstract after failing to conduct a reasonable investigation.[21]  *Id.* at 20-22, 215 N.W.

2d 155-56.  It follows then that a claim for negligent misrepresentation under Michigan

law can be based on omissions so long as there is a duty to disclose.[22]  Moreover,

although the parties have not directly addressed the issue, this Court believes that proof of

individual reliance is unnecessary for negligent misrepresentation claims based on an

omission.  *Cf. Lackowski*, 2001 U.S. Dist. LEXIS 25634, at * 26-27; *Gasperoni*, 2000

U.S. Dist. LEXIS 20879, at *19.  Consequently, the HL Defendants are not entitled to

summary judgment with respect to Plaintiffs' negligent misrepresentation claims.

## V.    Conclusion

For the foregoing reasons, the HL Defendants are entitled to summary judgment as

to Plaintiffs' misrepresentation-based federal and state law securities fraud claims,

---

[21]Furthermore, the court in *Polgar* recognized that the difference between a fraud claim and one for negligent misrepresentation is that the misrepresentation or omission giving rise to a fraud claim must be made with scienter.  *See id.* at 20-21, 215 N.W. 2d at 156.

[22]This Court believes that the HL Defendants' reliance on *The Marble Cleary Trust* for the proposition that "Michigan does not recognize a claim for 'negligent misrepresentation' premised on a Defendant's omissions" is misplaced.  (HL Dfts.' Rep. Br. #2 at 23.)  The Michigan Court of Appeals in *The Marble Cleary Trust* stated that "this Court has declined to extend the tort of negligent misrepresentation beyond the misrepresentation of facts that can be independently verified."  *The Marble Cleary Trust*, 262 Mich. App. at 502, 686 N.W. 2d 783.  As indicated above, the negligent misrepresentation claim in *Polgar*, the first Michigan court to recognize a negligent misrepresentation claim, was based on an omission.  This alone suggests that a negligent misrepresentation claim can be premised on an omission.  Moreover, the omission in this case – Kisor's access to Agave's ED&F Man and bank accounts, is a fact "that can be independently verified."  *The Marble Cleary Trust*, 262 Mich. App. at 502, 686 N.W. 2d 783.  Therefore, in this Court's opinion, *The Marble Cleary Trust* does not preclude Plaintiffs from asserting a negligent misrepresentation claim based on an omission.

misrepresentation-based common law fraud claims, conspiracy to defraud claims, and the breach of fiduciary duty claim in the *Cliff* complaint.

Accordingly,

**IT IS ORDERED** that the HL Defendants' motions for summary judgment are **GRANTED IN PART AND DENIED IN PART** as follows:

**IT IS ORDERED** that the HL Defendants' motions for summary judgment are **DENIED** with respect to Plaintiffs' omission-based securities fraud claims brought under federal and state law against Hyman Lippitt.

**IT IS FURTHER ORDERED** that the HL Defendants' motions for summary judgment are **GRANTED** with respect to Plaintiffs' misrepresentation-based securities fraud claims brought under federal and state law against Hyman Lippitt.  Plaintiffs' misrepresentation-based securities fraud claims brought under federal and state law are **DISMISSED** as to Hyman Lippitt.

**IT IS FURTHER ORDERED** that the HL Defendants' motions for summary judgment are **DENIED** with respect to Plaintiffs' common law silent fraud claims against Hyman Lippitt.

**IT IS FURTHER ORDERED** that the HL Defendants' motions for summary judgment are **GRANTED** with respect to Plaintiffs' misrepresentation-based common law fraud claims against Hyman Lippitt.  Plaintiffs' misrepresentation-based common law fraud claims are **DISMISSED** as to Hyman Lippitt.

**IT IS FURTHER ORDERED** that the HL Defendants' motions for summary

judgment are **GRANTED** with respect to Plaintiffs' conspiracy to defraud claims against the HL Defendants. Plaintiffs' conspiracy to defraud claims are **DISMISSED** as to the HL Defendants.

      **IT IS FURTHER ORDERED** that the HL Defendants' motions to dismiss the breach of fiduciary duty claim asserted in the *Cliff* complaint is **GRANTED**.

      **IT IS FURTHER ORDERED** that the HL Defendants' motion to dismiss the breach of fiduciary duty claim asserted in the *Burket* complaint is **DENIED**.

      **IT IS FURTHER ORDERED** that the HL Defendants' motions for summary judgment are **DENIED** with respect to Plaintiffs' negligent misrepresentation claims against Hyman Lippitt.

                                 s/PATRICK J. DUGGAN
                                 UNITED STATES DISTRICT JUDGE

Copies to:
Counsel of Record